UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

AVOYELLES PARISH SCHOOL BOARD     CIVIL ACTION NO. 08-1364

VERSUS                            DISTRICT JUDGE JAMES T. TRIMBLE

UNITED STATES
    DEPT. OF INTERIOR, et al     MAGISTRATE JUDGE JAMES D. KIRK

REPORT AND RECOMMENDATION
With Reduced Time for Objections

Before the court is a motion to dismiss filed by the United States, doc. #40, and motions for summary judgment filed by the Avoyelles Parish School Board, doc. # 39 and by White Oak Farms, Inc. and Bunkie Elevator and Gin Co., Inc., doc. #46. The motions have been referred to me by the district judge for report and recommendation.

This is a suit for a servitude of passage under Louisiana law (access easement) to an enclosed estate filed by the Avoyelles Parish School Board (the school board), owner of the enclosed estate. The property is described as all of Section 16, Township 3 North, Range 6 East, Avoyelles Parish, Louisiana. As required by Louisiana law, plaintiff sued all of the contiguous landowners lying between its property and the nearest public road, being the United States to the southwest, White Oak Farms, Inc. to the south (White Oak), Bunkie Elevator & Gin Co., Inc., also to the south (Bunkie Elevator), and Laborde Paradise, LLC to the southeast,

(Laborde). Access to the school board's land is historically by way of Louisiana Highway 452, which the parties agree is a public road. From the end of Highway 452, access is by way of the continuation of the same road, which is an unpaved road known as White Horse Road[1] to the first intersection, locally known as "first crossing", then by way of the continuation of the same road which from that point is mostly[2] known as Lac[3] Long Road or Lake Long Road, to "Third Crossing Road"[4] and into plaintiff's property. Specifically, the access roads--Highway 452, Lac Long Road, and Third Crossing Road--run through property acquired in 1988 by the United States through the Fish and Wildlife Service for use as the Lake Ophelia Wildlife Refuge.

The school board has enjoyed access to this property since Louisiana became a state and has enjoyed access through the government lands since the government bought them, almost 20 years ago. However, when a new refuge manager came along about two years

---

[1] This portion of the road is also sometimes called Lac Long Road or Lake Long Road since the road is one continuous stretch of road.

[2] Counsel have suggested that some "locals" may refer to it , or a portion of it, as White Horse Road. The road is one continuous road but perhaps referred to by different names in different parts, by different people.

[3] "Lac" means "lake" in French. The area of the state surrounding and including the area which is the subject of this suit is of French heritage.

[4] This road intersects Lac Long Road at what is referred to by counsel as "third crossing". For convenience, I refer to the existing road, from third crossing to the school board's land in Section 16 as "Third Crossing Road". On the attached plat, the road is generically labeled "U.S. Wildlife and Fisheries Road".

ago, the Fish and Wildlife Service chose to deny the school board access through its lands unless it signed a use permit under the National Wildlife Refuge System Administration Act, 16 U.S.C. §668dd (NWLRSAA or "the Act"). The proposed permit contained "Special Conditions" as follows:

1) The school board had to promise to provide a copy of the permit to everyone entering its property

2) The government would permit the school board to use its own property only during "regular refuge hours" which is 4:00 a.m. to one hour after sunset during hunting season and only during daylight hours otherwise.

3) The government restricted the kind of vehicles the school board could drive to only "standard motor vehicles".[5]

4) No vehicles could be stopped or parked on the refuge.

5) No vehicles could be parked overnight on the refuge.[6]

6) All firearms must be unloaded and put in a case or dismantled while a person crosses the refuge to school board property.

7) Vehicle access is limited to "vehicles with a wheel/tire combination having a maximum radius of 17 inches".

8) The school board had to agree to be "responsible" for the actions of its permittees.

---

[5] No definition is provided and the meaning is not intuitive.

[6] This restriction is obviously redundant.

9) All refuge regulations would otherwise apply.

The proposed permit was attached to a letter sent to the school board on September 4, 2008[7] which letter was accurately described by the school board's attorney as a "cram down letter", saying, essentially, take it or leave it.[8] Because the school board refused to permit its neighbor to dictate how it could use its own property by signing the permit, it then had no access whatsoever to its land, and no way to use its land, this suit was filed. The suit was timely removed to this court. These motions followed.

## The Law of Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure mandates that a summary judgment:

> "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, [submitted concerning the motion for summary judgment], if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

Paragraph (e) of Rule 56 also provides the following:

---

[7] The proposed permit had been previously presented to the school board.

[8] The government's attitude and its actions in this case do not comport with the express statutory mandate of Congress in the Act where it is provided that "the Secretary shall – (E) ensure effective coordination, interaction , and cooperation with owners of land adjoining refuges and the fish and wildlife agency of the States in which the units of the [refuge] System are located."

"When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party."

Local Rule 56.2W also provides that all material facts set forth in a statement of undisputed facts submitted by the moving party will be deemed admitted for purposes of a motion for summary judgment unless the opposing party controverts those facts by filing a short and concise statement of material facts as to which that party contends there exists a genuine issue to be tried.

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict *412 in her favor." Lavespere v. Niagara Mach. & Tool Works, Inc., 910 F.2d 167, 178

(5th Cir.1990) ( citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The moving party bears the burden of establishing that there are no genuine issues of material fact.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. See <u>Celotex</u>, 477 U.S. at 325, 106 S.Ct. 2548; see also <u>Lavespere</u>, 910 F.2d at 178. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. See <u>Celotex</u>, 477 U.S. at 324, 106 S.Ct. 2548. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue exists for trial. See id. at 325, 106 S.Ct. 2548; <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir.1994); <u>Austin v. Will-Burt Company</u>, 361 F. 3d 862, (5th Cir. 2004). This burden is not satisfied with "some metaphysical doubt as to the material facts," by "conclusory allegations," by "unsubstantiated assertions," or by only a "scintilla" of evidence. <u>Little</u>, id.

All evidence must be considered, but the court does not make credibility determinations. If the movant fails to meet its initial burden, summary judgment should be denied. <u>Little</u>, 37 F.3d at 1075.

6

<u>The Law of Enclosed Estates</u>

Louisiana law with regard to the right of access to an enclosed estate is found in La. CC Art's. 689 to 696 and the jurisprudence interpreting and applying those rules.

Article 689 provides:

The owner of an estate that has no access to a public road may claim a right of passage over neighboring property to the nearest public road. He is bound to indemnify his neighbor for the damage he may occasion.

The legal servitude of passage is predicated on necessity. The test is satisfied when an estate has no access or the access is insufficient for the needs of the estate. See Yiannopoulos, *La. Civil Law Treatise, Predial Servitudes*, §93 (2d Ed. 1997). A "public road" is any place that is open to vehicular traffic by members of the general public, even if the public is unlikely to use the road except to go to a particular place, and maintained by the public. <u>Kavanaugh v. Bowers</u>, 826 So.2d 1165 (La. App. 5th Cir., 2002), writ den. 828 So.2d 575 (La. 2002); La. CC Art 457.

Article 690 provides:

The right of passage for the benefit of an enclosed estate shall be suitable for the kind of traffic that is reasonably necessary for the use of that estate.

Therefore, the scope of the right of way is determined by the actual needs of the enclosed estate. <u>Davis v. Culpepper</u>, 794 So.2d 68 (La. App. 2nd Cir. 2001, writ den. 804 S.2d 646 (La. 2001). The owner of the enclosed estate may thus construct on the right of way the kind of road reasonably necessary for the exercise of the right

of way. La. CC Art. 691.

Article 692 provides:

The owner of the enclosed estate may not demand the right of passage anywhere he chooses. The passage *generally* shall be taken along the shortest route from the enclosed estate to the public road at the location least injurious to the intervening [servient estate] lands. (Emphasis added.)

The term "generally", as used in the article is an acknowledgment that there are exceptions to the rule that the passage shall be taken along the shortest route to the public road. Two of the exceptions were recognized in <u>Davis v. Culpepper</u>, supra: first, where the estate that provides the shortest route is covered by water or is otherwise not accessible year-round and, second, where the costs associated with crossing the estate which provides the shortest route makes it economically infeasible. Although <u>Davis</u> recognized only those two exceptions, other cases have applied other considerations in determining the best route, even if it is not the shortest. For example, some cases have considered whether the route is the route which has historically been used to gain access to the property. See <u>Bailey v. McNeely</u>, 918 So.2d 1124 (La. App. 3d Cir. 2005); <u>Bouser v. Morgan</u>, 520 So.2d 937 (La. App. 3d Cir. 1987); <u>Martini v. Cowart</u>, 23 So2d 655 9 La. App. 1945); <u>Braxton v. Guillory</u>, 721 So.2d 114 (La. App. 3d Cir. 1998). Others have considered the fact that a particular route might bifurcate the servient estate. See <u>Pearson v. Theriot</u>, 534 So2d 35 (La. App.

3d Cir. 1988). No doubt there are other conceivable and valid exceptions which the <u>Davis</u> court did not envision. Some possible exceptions come readily to mind, for example the fact that a proposed route would traverse a military base or other sensitive government compound or where, for example, the route would cross through a nuclear facility. The point is that there may be numerous reasons a shorter route might legitimately be rejected in favor of a longer route, other than the two situations recognized in <u>Davis</u>.

Some Louisiana cases recite a simple formulaic approach to determining where a servitude of passage should be located, by suggesting that, first, the shortest distance should be determined and only then should a balancing test be utilized to determine where on the servient estate the servitude should lie. See, e.g. <u>Davis</u>, supra at p.74; <u>May v. Miller</u>, 941 So.2d 661 (La. App. 3rd Cir., 2006) at p. 666. Nevertheless, the cases, included the two cited ones, do not apply such a ritualistic matrix but instead consider whether a route other than the shortest route may be preferred. See <u>Davis</u>, supra at p. 74; <u>May</u>, supra, p.667; <u>Cash Point Plantation Equestrian Center, Inc. v. Shelton</u>, 920 So.2d 974 (La. App. 2d Cir. 2006). The true test has been stated as requiring the court to consider not only distance, but also the least injury to the servient estate and the most practicable way. <u>Mercer v. Daws</u>, 186 So.2d 877 (La. App. 1939). Stated differently, even if not the shortest, the route chosen might well provide the most

practical, feasible and aesthetic resolution possible. Bailey v. McNeely, supra.


## The Law of Public Roads

As stated above, La. Civil Code Article 457 provides that a public road is one that is subject to public use. Professor Yiannopoulos has explained that, in modern times, "it became settled that the public may acquire in Louisiana an interest in the land on which a road is built or in the use of a road in a variety of ways. Thus, the public may acquire land or a servitude for the construction and maintenance of a public road by one of the methods of the Civil Code by which ownership or servitudes are acquired, including purchase, exchange, donation, expropriation and prescription. Most frequently, however, the public acquires an interest in a road by dedication." See Yiannopoulos, *La. Civil Law Treatise, Property*, §62 (2d Ed. 1980).

Professor Yiannopoulos lists several ways a road can be dedicated: 1) formal dedication by written act, 2) implied dedication by clear offer and acceptance, 3) statutory dedication under LSA-R.S. 33:5051, and 4) tacit dedication pursuant to LSA-R.S. 48:491. In addition, the professor explains that, in the case of a river road, there might exist a legal servitude and, finally, a road might be acquired with 30 years use by acquisitive prescription. La. CC Arts. 740, 742.

The professor's analysis clearly is concerned with acquisition of land or a servitude for a public road. However, the court notes, that at least for one limited purpose, some roads have been considered public without regard to whether there is ownership of the bed of the road or even a servitude. Specifically, it has been held that a particular road on private property might be considered to be a "public road" for purposes of application of Louisiana's non-resident motorist law. See Galloway v. Wyatt Metal and Boiler Works, 181 So. 187 (1938).

Analysis

All of the roads which provide access in this case lie within the United States' land, being the Ophelia National Wildlife Refuge. While, as noted, there is a legal question pending in this court as to whether Lac Long Road is a public road[9], there is no question that Highway 452 is a public road. Therefore, the United States has admitted that the "nearest public road" and the most appropriate route, i.e., the shortest and best route, is through its lands by way of the historical access-Highway 452, Lac Long Road, and then Third Crossing Road onto plaintiff's property. Therefore, for purposes of the plaintiff's claims in this case, it does not matter whether Lac Long Road is public or not. The government property is the servient estate and access over the historical route, Third Crossing Road, is most appropriate, as

---

[9] See 08-1374.

11

admitted by the government. See attached plat.

Therefore, the only issues are whether the case should be dismissed as urged by the government, whether the government can require a permit and the parameters of the servitude, including any needed restrictions on its use.

<u>The government's arguments</u>

The government has filed a "Disclaimer of Interest and Motion to Dismiss" in which it attempts to circumvent the jurisdiction of this court and prevent it from solving the dispute between the government and the school board by suggesting it is disclaiming any interest in the servitude. It's argument is that prior to the government's acquisition of the land, the land was burdened by a legal servitude of access in favor of the school board under Louisiana law[10], citing Magistrate Judge Hayes' excellent and well-researched and well-written opinion in <u>Batton v. United States[11]</u>,

---

[10] In Batton, Judge Hayes explained: "Article 689 of the Louisiana Civil Code, which governs servitudes of passage for enclosed estates, is not self-executing. It does however confer on the owner of an enclosed estate a **legal** servitude on the subordinate property which entitles the owner to a forced passage for indemnity. The enclosed landowner has the right to go into court and demand that the passage be fixed, and the establishment of the location of the right of way either through agreement or by judicial decision, is a **conventional** servitude of passage. *See* La. Civ. Code Ann. art. 689; A. Yiannopoulos, 4 *Louisiana Civil Law Treatise, Predial Servitudes* § 92 (3rd ed. 2004). Thus, while the location of the passage has not yet been fixed, the Batton's right to such a passage exists by operation of law, and the Battons may avail themselves of the QTA's waiver of sovereign immunity."

[11] The Batton case is similar to this one but is one in which numerous arguments were raised by the government in an attempt to defeat the plaintiffs' right to access its own property. Judge Hayes' opinion thoroughly discusses those issues, including the Quiet Title Act, sovereign immunity, the applicability of the Administrative Procedures Act, preemption of Louisiana's enclosed estates laws, and the government's authority to impose restrictions on an access servitude. It is an

docket number 05-1219 (W. D. La. 2006). It reasons that since the affidavit of the refuge manager, Wehrle, attached to the motion, recognizes the right of the school board to a servitude, there is no dispute.

However, the affidavit does not recognize the school board's right to a servitude as provided by Louisiana law and instead makes a legal argument that the school board must obtain a permit from the refuge in order to use its own property, and that, if the school board didn't like the restrictions contained in the permit imposed by the refuge, it could appeal in an administrative process. Therefore, the government has conceded nothing and has disclaimed nothing. Its "disclaimer" does not recognize the servitude rights to their full extent <u>as defined by Louisiana law</u> but rather seeks to impose the refuge's own ideas as to what the servitude should be by bureaucratic fiat and without court oversight. The Quiet Title Act is the appropriate method to seek access to enclosed lands, including all inherent issues such as the location of the servitude, its extent, and restrictions, if any, that may be legally imposed. <u>Batton</u>, supra and authorities cited therein. Indeed, the government's motion and the affidavit attempt to prevent this court from considering the propriety of the government's actions in denying the access which is guaranteed by

---

informative work in the context of this case. The government has not raised most of those issues in this case.

law in Louisiana.

Next, the government argues that the school board should have appealed the refuge manager's edict within the Fish and Wildlife Service. This argument was foreclosed in <u>Batton</u> where Judge Hayes explained that "numerous courts have held that the APA does not apply to claims filed pursuant to the QTA." Here also, as in <u>Batton</u>, such an administrative appeal would be futile in view of 1) the cram down letter reflecting the same attitude set forth in the affidavit of Wehrle, 2) the government's refusal to even respond to the school board's offer to discuss settlement, 3) the government's refusal to alter its position even after the first hearing in this case in which the government was advised of the court's initial inclinations in the case which were based on the applicable law, evidence, and the arguments of counsel in that hearing,[12] and 4) the fact that an appeal would be meaningless since, as will be seen[13], the government has no right to prevent the full use of the servitude under Louisiana law as recognized by a court.

The government also argues that the case should be dismissed because it is unfair to the government to make it litigate "the reasonableness of a permit". This case is not about litigating a

---

[12]    At the May 5th hearing the Asst. U. S. Attorney stated that she had passed on the court's comments to her "client" after that hearing.

[13]    See infra, pp.18-19.

permit–it is about recognizing an access servitude under Louisiana law and establishing its parameters according to the legal framework set forth in Louisiana's Civil Code. A permit has nothing to do with it, as will be seen. What is unfair is the government believing it has the right to tell its neighbor when and how it can use its own property by requiring its neighbor to come to it for permission to use it. The absurdity of this notion is obvious.

The Act

I find nothing in the NWLRSAA which allows the government to impose restrictions on or to require permits regarding servitudes (easements or rights of way) which lawfully cross refuge lands.[14] While the Act does allow the refuge to grant a permit for an easement upon request, that is not the situation here. The plaintiff does not seek a permit from the refuge for access but seeks only, through this proceeding, a recognition of its

---

[14] In Batton, a case like this one dealing with the National Wildlife Refuge Administration Act, Judge Hayes interpreted case law to be that the government could place reasonable restrictions on an easement, citing Skranak v. Castaneda, 425 F3d, 1213 (9th C. 2005); McFarland v. Norton, 425 F.3d 724, (9th C. 2005, and Montana Wilderness Assoc. v. United States, 496 F. Supp. 880 (D. Mont. 1980). I do not find the cases persuasive for the assertion that the government can place restrictions on an easement under the Act. Skranak did not deal with the NWLRAA but dealt with an Alaska mining claim in a national forest and the issues had to do with negotiated permits, not with whether the government could regulate an access easement otherwise. Likewise, McFarland did not deal with the NWLRAA but with the Park Service. It held only, as relevant here, that the servient estate could, if necessary, place a gate across the access easement. Louisiana law is to the same effect (Stuckey v. Collins, 464 So.2d 346 (La. App, 2d C. 1985). Montana dealt with an easement granted by the United States and the court held that the government therefore retained the right to reasonably regulate it. I respectfully disagree with Judge Hayes' interpretation of the three cases ; none stands for the proposition that the NWLRAA allows restriction of a state-created right of access to an enclosed estate.

preexisting right under Louisiana law to access its property. The government has not pointed the court to any provision within the Act which provides for a permit in this situation or which allows the government to regulate or place restrictions on such a legal easement.

The government cites <u>Burlison v. United States</u>, 533 F.3d 419 (6th Cir. 2008) as having recognized the authority of a wildlife refuge in Tennessee to require a permit for the use of a preexisting easement. The <u>Burlison</u> court embarks on a very detailed analysis of the Act in order to determine whether the Act authorizes the government to require the holder of a pre-existing easement (an easement by reservation in a prior deed) to obtain a permit from the government to go to its own property. In the analysis, the court parses the language of the Act, contemplates the placement of commas in it, and reviews its legislative history before concluding that nothing in the Act or its legislative history provides for the regulation or permitting of a pre-existing easement. I agree that the Act contains no provision which allows the government to require a permit to use a legally recognized pre-existing easement.

Nevertheless, the <u>Burlison</u> court found that the federal government could use its "police power" to regulate the private, pre-existing easement. The basis for the court's conclusion is that, because Tennessee law permits exercise of the police power

16

over private easements, such power could also be exercised by the federal government on its lands in Tennessee.

I respectfully reject the suggestion that some general police power allows the government to require a permit in order to use a pre-existing, legally recognized, easement. First, if Congress had wanted to grant such broad powers of regulation to the Secretary of the Interior, it could have said so. In that case it would then be appropriate to consider whether Congress has the Constitutional power to regulate private land interests.[15] However, Congress did not do that. Second, even assuming the Burlison court was correct in looking to state law for the police power and then extending that authority to the federal government, unlike in Tennessee, I find no authority in Louisiana supporting the proposition that the police power to regulate roads extends to private servitudes of passage.[16] However, this issue has not been expressly raised by the government or briefed and is only presented as something discussed in the Burlison case, cited by the government.

It is troubling that the Burlison court suggests that the government's neighbor should first apply for a permit, then, if it is denied, or if it does not like its terms, should file a federal

---

[15] See discussion in Burlison, pp.432-3.

[16] There are cases permitting the application of police power to drainage easements. See, e.g. Carbo v. City of Slidell, 844 So.2d 1 (La. App. 3d C. 2003).

lawsuit contesting the terms of the permit. So, while the government would be free to use its property, next door, its neighbor could not use its property but instead would have to engage lawyers and go through perhaps years of bureaucratic red tape and an expensive lawsuit in order to gain the right to use its property. That the Sixth Circuit suggested such an onerous and unfair process, which allows the government to place a bureaucratic and expensive burden on a neighboring property owner  is puzzling and is inconsistent with the  concept of ownership of private property and the freedoms that go with it.

The most troubling aspect of the Sixth Circuit's decision, however, is that it mandates the non-productive exercise of requesting a permit to do something the applicant already has a legal right to do. The refuge could not legally refuse to grant a permit to use an easement which already exists under state law. That is especially true in Louisiana where the Codal scheme governing the access right provides for its parameters to be established by the court. See discussion, infra, at pp. 19-20; Batton, supra.

Therefore, I do not read into the Act any right, based on "police power", to require that persons seeking a right of passage through a federal refuge to an enclosed estate under Louisiana law

must request a permit from the government to do so.[17]

<u>Louisiana law</u>

However, there is, under Louisiana's rules governing servitudes, La. CC Art. 697, *et seq.*, and under its enclosed estate laws, La. CC Art. 689 *et seq.*, a right of the servient estate to ask the court to place reasonable restrictions, if needed, on the use of the servitude. See <u>Toups v. Abshire</u>, 979 So2d 616 (La. App. 3d Cir. 2008); <u>Martini v. Cowart</u>, supra. Such a right may certainly be inferred from the Codal requirement that the scope of the passage is determined by the actual needs of the enclosed estate. La. CC Art. 690; <u>Davis v. Culpepper</u>, supra. But it is also expressly included in the definition of the servitude of passage in La. CC Art. 705 which provides:

> The servitude of passage is the right for the benefit of the dominant estate whereby persons, animals, or vehicles are permitted to pass through the servient estate. Unless the title provides otherwise, *the extent of the right and the mode of its exercise shall be suitable for the kind of traffic necessary for the reasonable use of the dominant estate. (Emphasis added).*

"The owner of the servient estate may do nothing tending to diminish or make more inconvenient the use of the servitude." La. CC Art. 748. However, the dominate estate must exercise its rights "in a way least inconvenient for the servient estate." La. CC Art.

---

[17] Burlison also noted that, under the "reasonable use doctrine", the government has the right to require that the easement be used in a reasonable manner. The court found that right did not, however, give the government the right to require permits.

743.

It is by application of these legal principles by a court determining the "extent of the right and the mode of its exercise" that the needs and concerns of the servient estate, here the government, are properly taken into consideration.

In other cases, the placing of a speed limit and speed bumps has been confirmed as a reasonable restriction (Toups, supra), as has the placement of a gate (Stuckey v. Collins, 464 So.2d 346 (La.App. 2d Cir. 1985)).

The government's proposed restrictions

1) First, the government seeks to prohibit the school board from using its property except from 4:00 a.m. to one hour after sunset during hunting season and only during daylight hours otherwise. The only argument presented why this proposed restriction is needed by the refuge is that those are the refuge hours and the refuge does not want anyone on the refuge "after hours". Yet the evidence and argument shows that the refuge is not fenced and anyone can gain access to the refuge at any time if they are not familiar with the rules prohibiting it. While the government argues that it does not have the manpower to patrol all of the refuge, there has been no showing that this area of the refuge, where the servitude lies, is in any more need of patrolling than any other area. If the general public can be trusted to follow the rules and abide by them even in the absence of fences and

20

gates, then the school board can similarly be trusted not to stray from the easement as it traverses the refuge property. Indeed, the school board has been using the government's property for almost 20 years without the need for such a restriction.

Further, the government admitted in oral argument that there are other "in-holders" of land within the refuge and that no permit has been required of them or restrictions placed. There appears to be disparate treatment of the school board, for whatever reason, and this fact shows that the limitation regarding hours is not truly important to the refuge; otherwise it would be applied evenly.

Most important, though, is the fact that such a restriction would prevent the full use of the dominant estate. Its enforcement would mean that the school board, which owns its land just as the government owns its land, could not go onto its own property at certain times and would have but limited use of it.[18]

The reasonableness of a restriction ceases at the point where it is no longer just of benefit to the servient estate but begins to actually harm the dominant estate. While the placement of a speed limit or gate, for example, may be reasonable in particular cases, preventing a landowner from entering his own property

---

[18] I note that the restriction would also interfere with some of the plaintiff's rights to hunt on its property, for it prohibits, in effect, night hunting. Louisiana law allows night hunting of opossums and raccoons under limited circumstances. See LSA-R.S. 56:116(C)(1). 16 U.S.C.§668dd(c) provides that "... nothing in this Act shall be construed to authorize the Secretary to control or regulate hunting or fishing of resident fish and wildlife on lands not within the System."

whenever he wishes is not.

2) Next, the government seeks to limit the school board and its invitees from entering its property in anything but a "standard motor vehicle". It is not clear what the refuge means by a "standard motor vehicle". However, the needs of this rural land, used for hunting and recreation, might well include entry by vehicles such as recreational vehicles (RV's) and trailers used to haul ATV's and such. In the future, it is foreseeable that construction on the property might be considered, in which case well-digging trucks, lumber yard delivery trucks, concrete trucks, and brick trucks, flat bed trucks with heavy equipment on them and others might be needed. Specialized vehicles used in logging such as trucks carrying log skidders are not inconceivable for the use of the property. While there is no evidence that such heavy vehicles would regularly require access to the property, and that most of the traffic would likely be by RV, sedan or pick-up truck, the school board retains the right to have such vehicles enter its property if needed and is consistent with the needs of the property. Limiting entry to "standard vehicles" is not only ambiguous, but also unreasonable.

3) Third, the refuge does not want vehicles parked or stopped on the access road. I agree that the reasonable use of the dominate estate does not ordinarily require that vehicles park on the access road, except, of course, in an emergency. However, there may well

be times when a vehicle might stop on the roadway momentarily.[19]

4) Overnight parking on the roadway is not necessary for the enjoyment and use of the dominate estate, except in an emergency.

5) The requirement that weapons be unloaded and encased, or broken down, is reasonable for the protection of the servient estate and does not unreasonably interfere with the use and enjoyment of the dominate estate.

6) The government has failed to suggest any reason, much less a compelling one, for the suggested restriction of vehicles to those with a wheel and tire radius of 17 inches or less. Some of the vehicles listed above may have larger radii and yet are reasonably necessary for the use of the dominate estate. The government has provided no studies or research showing that such tires are detrimental to the servient estate. Even if they are, as mentioned, they are necessary to the dominate estate.

7) Next, the requirement that lessees be provided and have a copy of the permit in their possession is no longer relevant.

8) As far as the government's threat to restrict access, it simply does not have that right so long as the school board and its invitees do not stray from the servitude (as established by this court) and enter the refuge. If such were to occur, then certainly

---

[19] For example, someone exiting the property might encounter someone they know entering the property and stop momentarily to impart important information to them, or just to chat briefly. So long as it does not block others, this use of the easement is reasonable. A restriction prohibiting it is unreasonable.

the person would be subject to the rules and regulations of the refuge just as anyone else.

In summary, for the foregoing reasons, IT IS RECOMMENDED that the motion to dismiss by the United States, doc. #40 be DENIED, that the motion for summary judgment by White Oak, et al, doc. #46 be GRANTED, and that the motion for summary judgment filed by the school board, doc. #39, be GRANTED finding that the school board is entitled to judgment imposing a conventional servitude of passage under Louisiana's laws of predial servitudes and its enclosed estates laws through the property of the United States and along and to the full extent of Lac (Lake) Long Road and Third Crossing Road, to its Section 16 lands. It should be further ordered that the servitude be subject to the following restrictions only:

1) No overnight parking on the servitude except in an emergency.

2) The speed limit on the easement shall be the speed limit currently in place on the road.

3) Persons using the servitude must first unload and encase or dismantle their weapons.

### OBJECTIONS

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed.R.Civ.P. 72(b), the parties have five (5) business days from service of this Report and Recommendation to file specific, written objections with the clerk of court. A party may respond to another

party's objections within five (5) days after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the district judge at the time of filing. Timely objections will be considered by the district judge before he makes his final ruling. No extensions of time to object will be granted.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FIVE (5) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT UPON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UN-OBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED in chambers, in Alexandria, Louisiana, on this the 13th day of May, 2009.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE

